(63 App. Div. 264.)

### DUNHAM v. DUNHAM et al.

(Supreme Court, Appellate Division, First Department. July 9, 1901.)

Wills—Competency—Undue Influence—Verdict.

Deceased was 78 years of age, and enjoyed good health until about a month before she made her will, which was seven weeks before her death. She left four sons, three daughters, and children of a deceased son. One daughter married at an early age. Plaintiff and the two other sons, who contested the will, married and left the homestead. None of the married children ever contributed to testatrix's support, except plaintiff, who in 20 years had given her $100. The defendants, the two unmarried daughters, were sole legatees. They had always lived with testatrix. One, a seamstress, had for over 24 years earned from $6 to $11 per week, all of which she gave to her mother. The other had taught for 30 years, and gave her mother $28 per month. Three years before her death, testatrix said she was going to leave everything to the unmarried daughters, and asked a friend to write a note for testatrix stating that she did not leave it to her sons and married daughter, because they never contributed to her support. After the will was drawn, and two days before it was executed, this friend wrote such note, which testatrix then signed. There was some evidence of failing physical and mental powers during the three months preceding her death. The attending physician visited her twice before and twice after the will was executed, and believed her of sound mind. She paid her own bills up to within three weeks of her death, and kept charge of her money to the last. She visited with her neighbors until some time after the will was made, and they noticed no indications of failing mental powers. The three subscribing witnesses testified that when she executed the will she was about the house, and apparently in usually good health. *Held*, that a verdict that decedent was incompetent or unduly influenced by defendants in the execution of the will was not justified, and should be set aside.

Appeal from trial term, New York county.

Action by John R. Dunham against Margaret J. Dunham and another, individually and as executrices of the will of Margaret Dunham, deceased, to determine the validity of the will. From a judgment that the instrument was not the last will of deceased, and from an order denying a new trial, defendants appeal. Reversed.

Argued before VAN BRUNT, P. J., and PATTERSON, O'BRIEN, INGRAHAM, and LAUGHLIN, JJ.

Robert L. Redfield, for appellants.
Hector M. Hitchings, for respondent.

LAUGHLIN, J. The will was executed and attested in due form on the 11th day of August, 1898, and the testatrix died at her home, 1741 Bathgate avenue, borough of the Bronx, New York City, on the 30th day of the following September. After a contest by all the children except appellants and their brother Lewis, the instrument was duly admitted to probate in the surrogate's court of New York county on the 27th day of July, 1899. This action was then brought, pursuant to section 2653a of the Code of Civil Procedure, to determine its validity by a jury trial in this court. On the trial of the issue the jury was instructed that the will was properly executed, but it was left to them to determine whether, on account of incompetency of decedent, or the exercise of undue influence on the part of appellants, the instrument produced was her last will, and they found that it was not. The learned trial justice entertained a motion upon his minutes to set aside the verdict and grant a new trial, and it was argued at length. Decision was reserved, however, and he died before a determination of the motion. A case containing all the evidence was thereafter duly agreed upon and certified. Appellants then made this motion on the case at special term to set aside the verdict and for a new trial, and respondent at the same time moved for a judgment on the verdict, and for costs and an additional allowance. These motions were heard together, and resulted in the judgment and orders appealed from.

At the time of her death decedent had $265 in money, and was the owner of the house and lot where she lived, of the value of $6,500, and which had been the family homestead for more than 30 years. The will devises and bequeaths all of her property to the appellants. Her husband died in 1879. Decedent left as her heirs at law and next of kin four sons, three daughters, and two grandsons, children of a deceased son. At that time her household consisted of the appellants, her son Lewis, and the two grandsons. As has been seen, Lewis was not a contestant. The daughter Mary Gordon married and left home at an early age. The plaintiff and the sons Peter and Theodore also married and left the homestead. Their visits home were not frequent, and their habits were intemperate. It appears, too, that the respondent and his brother Theodore were harsh at times in their treatment of their mother and sisters when they did visit them. None of decedent's married children contributed anything towards the maintenance of the parental domicile, except

plaintiff, who testified that during a period of 20 years he gave his mother as much as $100. On the other hand, it appears without a dispute that the appellants were affectionate daughters, kind and attentive to their mother, and regularly turned over to her their earnings. Elizabeth was a dressmaker or seamstress, and for upward of 24 years she assisted her mother with the housework, did the family sewing, and earned from $6 to $11 per week, all of which was given to her mother. Lewis gave his mother $5 per week when working. Margaret had been teaching for 30 years, and gave her mother $28 per month, and contributed considerable in addition, in supplies, household furniture, and furnishings. This evidence is not disputed, and is also corroborated by disinterested witnesses, except as to the amounts. The decedent is described as a woman about 5 feet 4 inches tall, and weighing about 200 pounds. Up to the 1st of July, 1898, she appears to have enjoyed uniformly good health. She was 78 years of age. She possessed fair intellectual attainments, and sought to give her children educational advantages. She could read and write, and, Margaret testifies, would at times encourage her two grandchildren by competing with them in writing, and would spell words with them. Mary A. Cullen, a disinterested witness, except that she is a friend of the appellants, testifies that about three years previous to her death the decedent told her that she was going to make a will and leave her property to her two daughters, and wished her to write a note for her stating that she did not leave it to her sons and married daughter because they had never contributed to her support. On the 9th day of August, 1898, two days before the execution of the will in suit, but after it had been drawn and had been left at the house and was ready for execution, this witness, at the request of decedent, drew the following letter or note, which she thereupon signed in her presence:

"To Whom It may Concern: As my sons Lewis, John, Peter, Theodore, and my deceased son Frank did not help me to make or keep my house, and as my daughter Mary, wife of Alex. Gordon, married at an early age and left me, I think it is but just to leave my property to my daughters Margaret and Elizabeth, who have aided and taken care of me.
  "New York, August 9th, 1898.          Margaret Dunham."

Emma A. Forster testified that in the latter part of July, 1898, the decedent told her mother, in her presence, that she was going to make a will, and asked her to be a witness to the will, and told her the same reasons for giving her property to the girls that was afterwards expressed in the above note. Mary J. Bassford, another witness, testifies that she told her substantially the same thing in July, 1898. Wilhelmina Phelps, another witness, testifies that between the 1st and 8th of August, preceding her death, decedent came to her house and asked concerning Mr. Guernsy, the lawyer whom she afterwards employed to draw her will. The witness recommended him, and decedent then said she was going to leave her property to Margaret and Elizabeth, and assigned the same reasons for so doing. There is no dispute that as early as July 15, 1898, the decedent began to be ill. Dr. Joyce was called in on the 23d, and was there again on the 24th. He called her ailments vertigo.

and nausea. The plaintiff offered evidence tending to prove, directly and by admissions of the appellants, that the decedent had for some three months or more prior to her death been accustomed, more or less, to repeat herself in conversation; that she was unable to sleep, and would sit by the window most of the nighttime; that she was subject to dizzy spells, and did not go out alone; that she had hallucinations, especially about going to Woodlawn, and about her property, erroneously believing it to be mortgaged; that she talked incoherently, and had to be assisted out of her chair, and had to be supported when walking, and dragged her feet along; that she would sit for hours in her chair, looking out of the window with a vacant stare; that on July 23d she started out for a walk, and after going about 100 feet became unable to move her limbs, and had to be supported and helped back to the house, where she sat for hours without moving or speaking; that finally, on September 23d, she was confined to her bed, and slept from Tuesday, September 27th, to Friday, September 30th, with a brief awakening on the 28th, owing to a blast in the street, and died on the 30th from cerebral hemorrhage. On a recital of most of these assumed facts, a medical expert, who had never seen decedent, gave it as his opinion that the decedent was suffering from senile dementia. But he also testified that, without seeing her at the time, it was impossible to say what might have been the extent of her lack of mental power at any particular time; and he did not assume to say that she did not have lucid intervals, or show that she did not have sufficient mind or memory to make a will. The witnesses for the respondent who testified to such facts as were disputed by the appellants were Andrew B. Gordon, a son of Mary Gordon, one of the contestants, who saw his grandmother the decedent, only three or four times between the 23d of July and the 24th of September, but could not tell when; Margaret E. Mulhern, also a daughter of said Mary Gordon, who saw the decedent about July 10th, again about the 26th or 28th, and again about August 15th; Mary A. Gordon, one of the contestants; Mary A. Trainer, disinterested, who saw the deceased only on the 15th of August; and Harry A. Dunham, son of one of the contestants, who saw his grandmother only on the 7th and 8th of August. The appellants were given credibility by being called as witnesses by the respondents to give material evidence, but respondents objected to their testifying as to their mother's condition, on the ground that they were rendered incompetent by section 829 of the Code of Civil Procedure. It appears that decedent managed the house up to the last year of her life, and paid her own bills up to within three weeks of her death, and kept charge of her own money to the last. She was sufficiently well and strong to go in bathing in the Sound on July 4th. On the other hand, Dr. Joyce, the attending physician, testifies that he was called to see decedent on July 23, 24, August 24, and September 19, 1898; that there was nothing peculiar about her eyes, nor incoherent in her speech, that he noticed; that she was not in bed on any of these occasions; that the day of his first visit she had an anxious look,— disturbed as to her condition; that he conversed with her for five or

ten minutes; and that he believes that she was of sound mind. Letitia McGowan, who lived upstairs in decedent's house, testifies that she saw decedent almost daily, and spent much time in her company; that decedent walked about the house alone, and out in the garden and on the street; that on the 15th of August decedent came to her room and listened to a neighbor play on the piano, and that on the first Sunday in September decedent went out on the grass plot and had her picture taken with others of her family; that she noticed nothing peculiar in decedent's walk, conversation, expression, or countenance; that she never mentioned mortgages on the property, nor did she ever hear of her sitting hours with a vague stare in her eyes. Wilhelmina Phelps testifies that she had known decedent for 25 or 30 years; that she saw decedent in July, 1898, at decedent's house, and again at witness' own house on the 8th and 15th of August; that decedent asked about Mr. Guernsy as a lawyer, and said she was going to make a will and leave her property to her two girls; that witness suggested that it might make trouble, and decedent replied that she could not help it if it did; that decedent walked into her yard and up two steps, and sat on the third, and walked away again, and did not use a cane or anything else to walk with. Emma A. Forster saw the decedent frequently between July 15th and the time of her death, and never saw anything unusual about her walk, eyes, or actions. Decedent did tell her she was expecting an assessment for widening the street and curbing the sidewalk. Mary J. Bassford, 79 years of age, and a friend of decedent for 25 years, testified that she saw decedent often during the summer of 1898 at witness' house and at decedent's house; that the decedent called at her house August 10th; that the two houses were nine blocks apart. And Elizabeth testified that she and her mother walked there on that day. Mrs. Bassford testified further that she had frequent conversations with decedent, and nothing peculiar attracted her attention; that decedent never mentioned mortgages, and did not repeat herself; that her eyes were bright, and she was able to walk without assistance, and was active on her feet generally. This is the witness who testified to the reasons decedent gave for leaving her property to her daughters. The respondent also vouched for the credibility of the three subscribing witnesses to the will, by calling them as witnesses; and they each and all testified that the decedent was up and about and able to move around, and was apparently in usually good health and strength, on the day of the execution of the will. The decedent on the 11th of August, 1898, executed the will, which is simple in its terms; and, under the circumstances, the testamentary disposition of property therein made is perfectly sane and natural. There is no evidence of undue influence. The appellants did nothing that would not be expected of dutiful daughters, responsible for the care of their aged mother, to whom they were devoted, and who was fond of them. There is no evidence that she did not desire them with her constantly, or that they were not acting solely at her instance in what they did towards effecting the execution of the will. A careful examination and consideration of the evidence, a brief

summary of the essential features of which we have endeavored to epitomize, leads irresistibly to the conclusion that the finding of insufficient testamentary capacity to make a valid will is against the weight of evidence. The right of testamentary disposition would be unsubstantial and of doubtful value if the courts would decline to set aside a verdict of incompetency supported only by evidence tending to show old age advancing more rapidly than ordinarily, and the preliminary symptoms of approaching dissolution. In view of the circumstances, we have no hesitancy in saying that it appears to be explainable only on the theory that it is the result of passion, prejudice, or inattention to duty on the part of the jury.

It follows that the judgment and orders appealed from should be reversed on the ground that the verdict is against the weight of evidence, and a new trial granted, with costs to appellants to abide the event. All concur.

